UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

IN RE: )
BULLOCK GARAGES, INC. )
)
)
JEFFREY D. RICHARDSON, Chapter 7 )
Trustee for Bullock Garages, Inc., )
) Case No. 06-CV-2061
Plaintiff-Appellee, )
v. )
)
TERRY BULLOCK GARAGES, INC., )
)
Defendant-Appellant. )

**OPINION**

This is an appeal from an Opinion entered by the United States Bankruptcy Court for the Central District of Illinois (Bankruptcy Case No. 02-93419) brought pursuant to 28 U.S.C. § 158(a). In Adversary Case No. 04-09021, the Bankruptcy Court found in favor of the Chapter 7 trustee, Jeffrey D. Richardson, and against Defendant, Terry Bullock Garages, Inc. (TBG). Judgment was entered in the amount of $85,550.13 plus prejudgment interest. Following this court's careful and thorough review of the arguments of the parties and the Record on Appeal provided by the Bankruptcy Court, this court affirms the Opinion of the Bankruptcy Court.

FACTS

Bullock Garages, Inc. (BGI) was in the business of manufacturing and selling prefabricated garages since approximately 1985.[1] BGI operated four mills which manufactured the prefabricated garages. BGI also maintained sales offices and independent dealerships. Terry Bullock is TBG's

---

[1] BGI succeeded Curt Bullock Builders, Inc., which started a business of manufacturing prefabricated residential garages in 1952.

majority shareholder and president. On April 30, 1984, TBG entered into a dealership agreement, establishing a Springfield, Illinois, dealership for selling garages manufactured by BGI.[2] The dealership agreement was subsequently amended, and TBG established dealerships in O'Fallon and Bloomington, Illinois. Under the terms of the dealership agreements, TBG had the exclusive right to sell BGI products within that territory. Conversely, TBG was obligated to sell only BGI products. In the course of its business, TBG entered into contracts with its customers and, in turn, ordered garage kits from BGI. BGI then billed TBG for the garage kits that were built.

BGI was having financial difficulties in 2001, and, by 2002, BGI was insolvent. BGI's milling operations were reduced, and BGI was without funds to purchase materials, to pay its employees, or to pay its subcontractors. BGI had approximately 300 uncompleted garage contracts, and was unable to build the garage kits on its own prior to the conclusion of the 2002 construction season. TBG was keenly interested in BGI's continued viability and began negotiations to acquire BGI's business. The negotiations involved BGI's largest lender, Old National Bank, which held a first priority security interest in most of BGI's assets.

On September 5, 2002, Terry Bullock organized T.L. Bullock Builders, Inc. (TLBB). On September 6, 2002, TLBB entered into a contract with BGI. The effective date of the contract was September 7, 2002. Pursuant to the terms of this agreement, TLBB agreed to complete the approximately 300 uncompleted garages and enter into new contracts for prefabricated garages using BGI facilities and employees. TLBB employed BGI's workforce, including carpenters and mill workers, while BGI retained its management employees and maintained its sales force and corporate

---

[2] The 1984 agreement was actually with Curt Bullock Builders, Inc. However, there is no dispute in this case that the dealership agreements were assigned to BGI when BGI took over the business.

headquarters. The agreement required BGI (and its related companies) "to assign all existing customer garage contracts to [TLBB]." The agreement also provided that TLBB agreed "to honor and carry out those contracts by completing and/or building and erecting all garages under contract." TLBB agreed to pay for material and direct labor costs incurred in carrying out the terms of existing customer contracts. The agreement further provided that BGI was "not assigning any receivables to [TLBB]," but that TLBB agreed to collect the receivables of BGI, reimburse TLBB for its direct costs and a 10% profit and remit the balance to BGI. The agreement stated that "[f]or purposes of this paragraph, 'receivables' shall be considered to be not only current receivables but amounts earned in the future from existing contracts." The agreement also stated that "[a]ll new customer garage contracts after the effective date of this agreement shall be written in the name of and belong to [TLBB]." The terms of the agreement were set out in a notice to BGI's staff. This notice stated that "[a]ll contracts for garages entered into on Saturday, September 7, 2002, or thereafter will be entered into on behalf of [TLBB], which will assume complete responsibility for the performance of such contracts."

TLBB commenced operations on September 9, 2002, and operated using BGI's facilities and employees for about three weeks. TLBB completed approximately 150 garage kits during this time. Old National Bank then withdrew its consent from the arrangement and threatened litigation. TLBB ceased operations on September 27, 2002. During the three weeks it was in operation, all garages sold were built by TLBB. After the agreement terminated, BGI renewed operations and built approximately 100 additional garages. Old National Bank then initiated a foreclosure action against BGI. On November 1, 2002, BGI filed a voluntary petition under Chapter 11 of the Bankruptcy Code. BGI's bankruptcy case was subsequently converted to a Chapter 7 proceeding.

On March 19, 2004, Jeffrey D. Richardson, the Chapter 7 trustee, commenced an adversary proceeding against TBG. The trustee claimed that TBG purchased garages from BGI prior to BGI's bankruptcy and owed $94,852.29 in outstanding unpaid invoices. The trustee therefore sought judgment against TBG in the amount of $94,852.29 plus prejudgment interest. An evidentiary hearing was held on April 20, 2005.[3] At the hearing, TBG's dealership agreements and the September 6, 2002, agreement entered into between BGI and TLBB were introduced into evidence. Randy Bullock, BGI's president and sole shareholder, testified that, under the terms of the September 6, 2002, agreement, TLBB was to finish the contracts that were in existence prior to that date. He also testified that the receivables from those contracts remained assets of BGI but the obligation to build them became TLBB's obligation. He stated that BGI and TLBB entered into the agreement because they were trying to keep things running for a while until an agreement for Terry Bullock to buy the business could be negotiated, with the approval of Old National Bank. Sheila Falconer, BGI's comptroller, testified that it was her understanding that contracts that were signed prior to September 6, 2002, remained the property of BGI and were collectable by BGI. The trustee introduced a folder of invoices into evidence which showed the amount billed to TBG for garages built to fulfill contracts entered into between TBG and various customers. The contracts attached to the invoices showed that the contracts were dated prior to September 7, 2002.[4] The evidence

---

[3] At the hearing, the majority of the evidence presented actually related to another adversary proceeding filed by the trustee against Terry Bullock and TLBB. This proceeding, and the outcome, is not before this court. Therefore, the facts relevant to that dispute have not been recited by this court.

[4] This court's review revealed that one contract was actually dated September 7, 2002, and another contract was dated September 11, 2002. However, the Bankruptcy Court's finding that all of the contracts were entered prior to September 7, 2002, has not been challenged on appeal.

showed that no payment had been made by TBG to BGI or to TLBB for these invoices.

Terry Bullock testified that TBG had a credit coming on some of the invoices because the garages TBG received were short on some items. Documentation showing these credits was introduced into evidence. Terry Bullock also testified that BGI would not let him take two garages that were built for TBG. The deposition of Vicki McGuar was also admitted into evidence. McGuar testified that she is a tax accountant and provided accounting services for Terry Bullock, TBG and TLBB. McGuar testified that, under the terms of the September 6, 2002, agreement, TLBB was responsible for finishing contracts for BGI. She testified that they were given a list of the contracts to be completed. McGuar testified that contracts after September 6, 2002, were TLBB's contracts.

Following the evidentiary hearing, the trustee filed a Closing Argument and Brief. The trustee noted that, under the terms of the September 6, 2002, agreement, TLBB agreed to complete all existing garage contracts for cost plus a 10% profit and that all existing contracts were considered receivables, which were not assigned to TLBB. The trustee argued that garage contracts which TBG executed with customers prior to September 7, 2002, but which were not built by September 6, 2002, were BGI receivables. Therefore, he argued that TBG owed BGI for the amounts invoiced.

TBG filed a Responsive Closing Argument and Memorandum of Law. TBG made three arguments: (1) TBG was entitled to credits totaling $1,437.56 for shorted materials; (2) TBG should not be required to pay $7,864.60 for two garages which were never delivered to TBG; and (3) the garages were produced by TLBB, not BGI, so TBG did not owe anything to BGI. In support of its third argument, TBG contended that the order date shown on the invoices submitted by Trustee Richardson showed that all of these garages were ordered by TBG during the term of TLBB's production operations. TBG argued that it was the placing of the order by the dealer that formed

the contract with the manufacturer. TBG also argued that the garages were manufactured and delivered by TLBB. TBG argued that there "was no offer, no acceptance, nor performance by BGI of any contract with TBG with respect to" these garages. TBG argued that, based upon the September 6, 2002, agreement, the garage orders entered into during the term from September 7, 2002, and September 27, 2002, were contracts of TLBB, not BGI. TBG noted that none of these contracts were included in the list of BGI contracts assumed by TLBB under the agreement.

The trustee subsequently filed a Reply Brief. He stated that he did not dispute the $1,437.56 credit for "shorted" materials. The trustee argued, however, that TBG should be required to pay $7,864.60 for garage kits which TBG ordered, but never picked up. The trustee also argued that TBG clearly owed BGI for the garages that were built and delivered because, based upon the terms of the agreement, these garages were BGI's receivables, not TLBB's receivables.

On February 23, 2006, United States Bankruptcy Judge Gerald D. Fines entered an Opinion ruling on this adversary proceeding. Judge Fines noted that the burden of proof was upon the trustee to show by a preponderance of the evidence that the property in question was property of the bankruptcy estate and that there was an amount due and owing from Defendant TBG to the Debtor Corporation, BGI. Judge Fines stated that independent dealers, such as TBG, signed contracts to purchase garages, and, "although the contract was between the dealer and the customer, the exclusive right to build the garage kit that the contract called for belonged to the Debtor Corporation." Judge Fines further stated that the evidence at trial established that the accounts receivable the trustee sought to recover from TBG were generated from contracts entered between TBG and customers prior to September 7, 2002. Judge Fines then stated:

> As a result, the exclusive right to build the garages under these

>contracts belonged to the Debtor Corporation, and, in fact, invoices for these garages were billed by the Debtor Corporation to the Defendant. As such, the Court finds that the Trustee/Plaintiff has met his burden of proof establishing that the accounts receivable in question were property of the Debtor's bankruptcy estate and that the amounts due under these accounts receivable were the obligation of the Defendant.

Judge Fines found, however, that TBG was entitled to the credits requested of $1,437.56 and $7,864.60. After applying these credits, Judge Fines determined that TBG owed $85,550.13 to BGI. Judge Fines also found that it was appropriate to award pre-judgment interest at the rate of 5% per annum from March 19, 2004, the date the adversary proceeding was commenced, to the date of judgment. Therefore, on February 23, 2006, judgment was entered in favor of the trustee and against TBG in the amount of $85,550.13, together with pre-judgment interest at a rate of 5% per annum from March 19, 2004, to the date of the judgment.

TBG filed a notice of appeal and appealed Judge Fines' Opinion to this court.

## ANALYSIS

This court's standard of review of a bankruptcy court's decision is as follows: "the bankruptcy court's findings of fact are upheld unless clearly erroneous and the legal conclusions are reviewed de novo." In re A-1 Paving & Contracting, Inc., 116 F.3d 242, 243 (7th Cir. 1997).

On appeal, TBG is raising the following four issues: (1) whether the bankruptcy court erred in finding that BGI possessed the exclusive right to build the garage kits and, hence, also to recover the accounts receivable because the dealership agreements between BGI and TBG are indefinite and

illusory rather than enforceable requirements contracts; (2) whether, assuming arguendo that the dealership agreements were enforceable requirements contracts, the bankruptcy court erred in finding that BGI had an exclusive right to the accounts receivable generated by the manufacturing of the garage kits for TBG where there was no evidence adduced at trial that BGI performed its contractual obligations with respect to these garage kits; (3) whether the bankruptcy court erred in finding that the dealership agreements between BGI and TBG are enforceable requirements contracts instead of a series of separate contracts, each formed at the time TBG ordered a garage kit and, in any event, were contracts formed between TBG and TLBB rather than between TBG and BGI; and (4) whether certain accounts receivable, due for the manufacture of the garage kits, were due BGI rather than TLBB, where the garage kits were manufactured by TLBB while operating BGI's manufacturing plants per an agreement under which all accounts receivable for all new garage contracts were TLBB's property.

This court concludes that TBG is attempting to make a simple issue complicated, and, by doing so, create enough confusion to cast doubt on the Bankruptcy Court's well-reasoned and well-supported decision. This court declines to go down that path and agrees with the trustee that the only issue for this court to decide is whether the Bankruptcy Court properly held that the right to payment from TBG for the garages in question belonged to BGI.

TBG's arguments are based upon a challenge to the underlying dealership agreements between TBG and BGI. TBG has argued that the dealership agreements between TBG and BGI "are indefinite and illusory, rather than enforceable requirements contracts." TBG argues that an "unbroken line of Illinois cases holds specifically that, without any sales quotas or durational terms, a distributorship agreement lacks mutuality of obligation and thus, is not enforceable." The cases cited by TBG do, in fact, state that the lack of certain terms make a distributorship agreement not enforceable. See, e.g., Ryan v. Wersi Elecs. GmbH & Co., 3 F.3d 174, 181 (7th Cir. 1993); R.F. Barron Corp. v. Nuclear Fields

(Australia) Pty. Ltd., 1995 WL 653470, at *1 (N.D. Ill. 1995). In Ryan, the Seventh Circuit therefore held that such a contract is "terminable at the will of either party." See Ryan, 3 F.3d at 181; see also All Line, Inc. v. Rabar Corp., 919 F.2d 475, 479 (7th Cir. 1990) (this type of agreement could be terminated at any time); R.F. Barron Corp., 1995 WL 653470, at *3 ("the party claiming breach of contract could terminate the relationship when it so chose"). This court agrees with the trustee that there was no evidence presented that the dealership agreements between TBG and BGI were terminated at any time by either party.

Most importantly, however, Terry Bullock, TBG's president and majority shareholder, testified at the hearing that TBG was a Bullock dealer for 18 to 20 years. He specifically testified that, during that time, TBG bought its prefabricated garages from BGI and that he "didn't have any other source of supplier" because "that was in our dealership agreement." Therefore, there is no need to put the dealership agreements under the microscope because the testimony at the hearing clearly established that BGI was TBG's exclusive source for the garage kits it sold to its customers. This court also does not need to spend much time on TBG's argument that the evidence did not show that BGI performed its contractual obligation with respect to these garage kits. In fact, there is no dispute that TBG received all of the garage kits it was billed for, with the exception of two. The bankruptcy court excluded the two garages TBG did not receive in setting the amount owed by TBG.

TBG also argues that the right to the accounts receivable belonged to TLBB rather than BGI based upon the terms of the September 6, 2002 agreement. TBG contends that, when the agreement stated that new contracts after the effective date of the agreement would belong to TLBB, it meant that purchase orders received after the date of the agreement belonged to TLBB. In support of this proposition, TBG relies on the testimony of Jerry Bullock, who testified that he was a former employee of BGI. Jerry Bullock testified that, with respect to a particular contract, the relationship between TBG

and BGI began when TBG placed the order for the garage. TBG claims that Jerry Bullock testified that "contracts between the dealers and the manufacturer came into existence on the order date" and that his testimony is an "evidentiary admission." This court agrees with the trustee that TBG has mischaracterized Jerry Bullock's testimony and that, in any event, Jerry Bullock is not a party in this case and his testimony does not constitute an admission on this issue. In making this argument, TBG relied on <u>Solon v. Gary Cmty. Sch. Corp.</u>, 180 F.3d 844, 858 (7th Cir. 1999), which held that a party's "formal concessions in the pleadings, or stipulations by a party or its counsel" are binding on the party making them. In this case, there was no admission made by a party on this issue.

The fact is, the agreement provided that "receivables" for "existing customer garage contracts" remained the property of BGI and that "new customer garage contracts after the effective date of this agreement shall be written in the name of and belong to [TLBB]." TBG argues that "[t]his contract language is unambiguous, and is consistent with a finding that a contract formed only upon submission of a purchase order." This court agrees that the contract language is unambiguous. However, this court does not agree that the contract language "new customer garage contracts" can mean anything other than what it says. As previously noted, the evidence showed that the "customer garage contracts" entered into between TBG and its customers were dated prior to the effective date of the agreement. Therefore, these were "existing customer garage contracts" and the accounts receivable for these garages belonged to BGI. This court concludes that the language of the September 6, 2002, agreement could not be more clear. This court agrees with the trustee that, if the parties meant to say "purchase orders" or "dealer purchase orders" instead of "new customer garage contracts," it would have been a simple matter to say it.

This court concludes that there is no merit to any of the arguments raised by TBG. Following this court's careful and de novo review of the Bankruptcy Court's legal conclusions, this court

concludes that the Bankruptcy Court correctly found that the accounts receivable for garage kits built based upon contracts entered into by TBG with its customers prior to September 7, 2002, were the property of BGI's bankruptcy estate and the amounts owed were the obligation of TBG.

In accordance with the above, the decision of the Bankruptcy Court is AFFIRMED in its entirety and this case is terminated.

ENTERED this 26th day of February, 2007.


s/MICHAEL P. McCUSKEY
CHIEF U.S. DISTRICT JUDGE